DOWD, District Judge,
concurring:
Although I concur in Judge Smith’s opinion, I write separately with respect to one issue.
Marcavage argues that it was reversible error for the District Court to allow defendants’ expert, Dr. llene Rosenstein, to testify on the ultimate issue of reasonableness under the MHPA, first, declaring that Bittenbender’s application contained no false information (a fact that was strenuously disputed by the plaintiff at trial) and, second, declaring that, on the facts presented by Bittenbender, he acted reasonably when seeking the involuntary emergency examination of Marcavage.[6]
*87 In my view, it was error for the District Court to permit expert testimony with respect to the question of whether Bitten-bender acted reasonably. This is not a matter that requires expert testimony. I have no problem with Dr. Rosenstein’s testifying as to the simple procedural steps which must be taken under the MHPA; however, her testimony went beyond that. In particular, I am troubled by what I consider to be, essentially, Dr. Rosenstein’s “vouching” for Bittenbender’s version of the facts as expressed by him in the application for the involuntary examination of Mareavage, as opposed to Marcavage’s version.[1] During cross-examination, while being questioned with respect to the facts set forth by Bittenbender on the application form, the following exchange occurred:
Q. If I’m following, you have testified that the descriptive narrative that Mr. Bittenbender signed here under oath was sufficient to meet the requirements of the Mental Health Procedures Act, correct?
A. Let me say two parts to that. One is that it doesn’t matter if it was sufficient or not. This was his statement of what he perceived was going on. And in my mind—so that is one piece. Because there are many people who fill out—who— quite frankly, oftentimes it’s rejected even when it’s filled out by the mental health worker. So there was enough in here that it was approved, even though it didn’t need the approval in my mind.
The second part, as a psychologist reading—as someone who does this all the time, it was sufficient stuff here to be of concern.
Q. When you say approved, you are referring to a mental health advocate?
A. Yes, I am.
Q. Now, the mental health advocate relies on the recommendations of the people making—
A. Correct.
Q. So if he is not telling the truth and they say—How significant is it that they approve an application that contains blatant false information?
A. I don’t believe these have false information.
Q. I’m not asking that. How significant with the mental health advocate is it if it contains blatant falsehoods, is that significant then?
A Is it significant? Yes, it’s a problem.
(Trial Day 5 at 191-92, emphasis added). When further pressed, her testimony was as follows:
Q. Doctor, is it fair to say based on answers such as that one that you really don’t allow for much possibility that there is another version of what happened that day that could have occurred, do you?
A. I believe what I said in this report, which is that, in fact, they did the exact thing I would want them to do. It was the right thing to do.
Q. But that all depends on your conclusion, Doctor—and you’re not the finder of facts—that Mr. Mareavage was in fact irrational, was in fact *88 mute; that there were legitimate reasons to be concerned?
A. His behavior as observed by Mr. Bittenbender clearly indicated to Mr. Bittenbender that this was a young man in crisis. This was beyond just slight agitation or annoyance. This was up to a point of serious mental illness. And because of that, he went ahead with the procedure.
Q. Doctor, can you assume that the actions of Defendant Bittenbender and Defendant Bergman in processing this application was not motivated by concern for his safety?
A. Why, no.
Q. You can’t, can you?
A. I can’t understand—from reading everything, I could not understand why—It seemed to me these were people that really, really eared and wanted to do a good job, I think, at their university, and cared about safety. They are both policemen.
Q. It was a simply yes or no. I’m just thinking to limit—so really you can’t consider any alternate, can you?
A. I did consider the alternate. In the beginning when I went through all the stuff, I went with an open mind reading the stuff. Mr. Tucker knows clearly I don’t do this as a profession. I’m not an expert witness. I have another full-time job and a family. So going through this stuff, I didn’t know which way I was going to go. My conclusion was absolutely that this was the right thing to do.
(Trial Day 5 at 199-201, emphasis added).
In my view, the District Judge abused her discretion by allowing Dr. Rosenstein to testify as an expert and to wander into the province of the jury by testifying as to whose facts she believed.
That having been said, I would not conclude, in light of the record as a whole, that this was reversible error. There clearly was enough testimony from which the jury could have independently decided that Bittenbender’s actions were reasonable and in compliance with the MHPA. In other words, although I believe it was error to allow Dr. Rosenstein to testify as to anything but the procedures relating to the MHPA, I also conclude that it was harmless error because the result would have been the same with or without her testimony.
I concur in the result.

. Marcavage argues that this error was exacerbated when the District Court refused to allow him to cross-examine Dr. Rosenstein regarding the medical reports of Drs. Villaluz and King, who examined Marcavage at the hospital and whose reports Dr. Rosenstein *87 had considered when forming her own expert opinion.

. Dr. Rosenstein listened to the testimony of several witnesses at trial, including that of Bittenbender, but not that of Mareavage. She was ill when Mareavage testified (see Trial Day 5 at 174); however, she did read his deposition testimony (see, Trial Day 5 at 195).